General. Mr. Gorzlewski. Mr. Gorzlewski. Yes, Your Honor. May it please the Court, Adam Gorzlewski here for the appellant, Hillary Kasian. I initially had requested five minutes for a rebuttal, but after viewing everything else, I think three minutes would be sufficient. Okay. You got it. So put two minutes back on the clock and please proceed. Thank you, Your Honor. This is a very important case. I think for all plaintiffs out there because... Can I ask you a question about that? Sure. If it's such an important case for all plaintiffs, why isn't there a reply brief? Your Honor, I felt that the issues that we stated in our initial brief sufficiently outlined the errors that were made. So the government had nothing to say that you thought needed response? I think a lot of the arguments that the government said in their brief merely parroted some of the errors that were made at the district court level. One of the main errors that I believe was made was changing the McDonnell-Douglas standard that has always been used in pretext analysis. When we were talking pretext in this case, it was very apparent in the district court's decision that it stopped at the employer establishing a legitimate nondiscriminatory reason for the termination and didn't go the extra step of allowing the plaintiff in the case to assert evidence that would rebut that legitimate nondiscriminatory reason. Let's focus on that for a moment. Let's assume for a moment that your best argument is, that your best evidence, I should say, is temporal proximity, right? So July 14th, July 19th, July 21st, right? Those are the three key dates, as I recall. What other evidence can you marshal besides temporal proximity to rebut the legitimate nondiscriminatory reason and put forth your best argument that the termination was pretextual? Your Honor, I think the record was littered with a number of instances that could show that it was not the actual reason why she was let go. The first and most glaring issue was the discovery that we got from the Postal Service showing that Mr. LaRue, the supervisor, previously had filled out one of these driver observation forms for another employee who had the exact same violations that he had alleged that she had committed. And on that form, and I questioned Mr. LaRue about this, there was a box where it could say what action was taken, and in that box nothing was written. On Mrs. Casian's, they had listed that there was a PDI, or predisciplinary interview, that took place. And also on this other driver's record, it indicated that a discussion took place. And I asked Mr. LaRue, and I asked the postmaster, Mr. Olszewski, what a discussion is, and they both confirmed that a discussion is not actual discipline. It's essentially pulling the person aside informally and saying, here's the problem here, we need to make sure this doesn't happen again. It's not even a form of discipline. And what's important in that regard is both Mr. LaRue and Mr. Olszewski testified that the supervisors are the ones who are given the discretion in these cases, the discretion to impose discipline or not to impose discipline. In Mrs. Casian's case, he exercised his discretion on the exact same facts to impose discipline, which ultimately led to her termination, where in this gentleman's case he merely got a discussion. Mr. Cirosi, the union representative who was a part of the meeting where Mrs. Casian reported the sexual harassment, he also testified in his experience since 2009 that, again, the supervisors are given this discretion. In his experience, these types of issues are swept under the rug. He had had employees who had come to him who had been observed with their feet hanging out of the postal vehicle. They didn't get discipline. He testified about a transitional employee who had wrecked the postal vehicle into a wall and was not terminated for that. Just a number of instances that show that this type of issue does not lead to termination. So help us on the knowledge issue then. She complains on the 14th. He makes the observation on the 19th. She doesn't complain to him. She complains about him to someone else on the 14th. What other than temporal proximity allows us to infer that someone knew when the decision was made, someone knew about the complaint, when the decision was made sometime between the 19th and the 21st? I think all the factors that I just outlined are permitted to be looked at by a jury. The Azzaro case that I cited, also I believe it would be pronounced Wien case, which cited Azzaro, both make it very clear that just because somebody denies knowledge in these types of cases isn't preclusive, that you're entitled to look at the circumstances surrounding the situation to make a determination as to whether knowledge can be inferred. I cited the Woodman case from the Second Circuit. Does it matter that Ms. Casey herself said she couldn't remember whether she identified Mr. LaRue when she had that initial meeting? She didn't remember identifying anybody in particular, and the postal folks say we didn't know about Mr. LaRue. Respectfully, I believe that she did say that she identified Mr. LaRue, said she was tired of his sexual harassment, and Mr. Sorosi, the union rep who was there also. Mr. Sorosi says it in his deposition, and maybe I'm mistaken, but I thought she said she complained about the sexual harassment, but she did not recall that she identified anybody by name. Now, Mr. Sorosi, who said, no, she did, but she said, I don't remember, I thought, and the postal people emphatically deny that we didn't know anything about LaRue being identified. Your Honor, I would defer to the transcript specifically. It is my belief that she did, but even if she didn't testify to that, Mr. Sorosi testified to it, and what's interesting is Mr. Hauser, who was the other supervisor who was in that meeting, in his depositions, he denied that the meeting even took place when we have two witnesses who specifically say, yes, Ms. Casey was there, Mr. Sorosi was there, Mr. Hauser was there. He denies that he was even there. So to the extent that his testimony should be given any type of way, obviously that would be for a jury to decide, hopefully, but I think he loses a lot of credibility when two other witnesses say, oh, yeah, you were there. She had, just to make it clear here, I think the record is going to reflect from the joint appendix at like 68-ish, that she had complained about a couple of supervisors, and when asked she said, I might have mentioned both of them or just one. So she didn't have a recollection, it appears, of who it was. But even if we got past that and we were going to ask the question, just in a stark legal way, is it enough for temporal proximity to establish the causal link? Let's assume, for the sake of discussion here, that temporal proximity were all that we had as a legal matter, is that enough to say, okay, that can go to the jury? I think the case law supports that. The Jaleel case out of the Third Circuit had a two-day window where it was determined that that temporal proximity was sufficient to support an inference of causation. Likewise, the Fasold case that we also relied upon had a three-week window where it was determined. So our five-day window falls well within that. So I believe that, and especially when you factor in the weekend here, and we don't know the schedules that everybody had, a reasonable jury certainly could see that the first instance that Mr. LaRue had to observe Ms. Casey and find something to get rid of her, he utilized. So I absolutely believe, from a legal standpoint, that that would be sufficient in and of itself. Was it a Wednesday, Monday, Wednesday? It was a Thursday, Tuesday, Thursday, which was terminated ultimately on the following Thursday. Does the fact that Jaleel decided to drop the hostile work environment claims say anything about the reasonableness of her belief? Absolutely not, and I tell my clients this any time that they come in. If it's a hostile work environment case, that person has the opportunity to go to an attorney, discuss what's happening at work, and that attorney can give the well-reasoned opinion based on all of the case law out there to say a hostile work environment is a very high standard to meet. You have to basically say that the workplace is intolerable. When you're talking retaliation, there's a good reason why we don't have that because this is a person who might not think to go to an attorney and report the things. These things are happening to them in the workplace, and they do what any reasonable person would do. They go to their supervisor and they report it. I thought from your argument in the briefing that there was an effort to encourage us to think LaRue was out for her after that first meeting she had with Hauser, and that's why she was seen on the street because they were following her and looking for her. But your complaint itself uses the word coincidentally. Paragraph 39 of your complaint says, coincidentally, Mr. LaRue had been observing her. If it's happenstance that he's where she is and he sees the violation, doesn't that undercut your assertion that, oh, look, they were in for her and the temporal proximity alone will carry the day? Using the word coincidentally, it was based on what LaRue and the fellow supervisor testified to, that they were out doing their rounds and just happened to come across her, giving some credence to what they said. You trusted what they said on that? No, I didn't trust what they said. They put themselves in her proximity. They put themselves in the area where she would be doing her. But to Judge Jordan's question, if they're out to get her, they sure as heck intentionally put themselves in her proximity and they were following her intentionally, not coincidentally bumped into her. Well, they didn't put themselves in the proximity of where she's at. That doesn't mean that they necessarily were following right behind her the entire time. They put themselves in that area, and maybe that's why it took until Tuesday. And I don't know exactly how the Postal Service works, but I don't know if you could tell exactly where a character is going to be every moment of the time. You can put yourself in their territory. Well, they give them a route, right? They give them a route. But, I mean, isn't it easier just to say, I used the wrong word? Yes, Your Honor. That's fair. Okay.  Thank you, Judge. Thank you for your argument, and we'll hear now from Ms. Irwin. May it please the Court, Laura Irwin from the U.S. Attorney's Office in the Western District on behalf of the United States Postal Service. The key to this case is knowledge, and it's knowledge with regard to causation and knowledge with regard to pretext. I'd be happy to start with either one, whichever is appropriate. Let's just start with temporal proximity. We've got case law that suggests that in the appropriate case, temporal proximity alone can raise the inference of causation, right? Well, there is a case that says that. It's from, I believe, 1994, the Jalil case. But the more recent case, Daniels, indicates to me that it's going to be extremely unlikely to find temporal proximity alone. But in any event, you still have to show knowledge, and that's something that she has not met her burden on in this case. When you say she still has to show knowledge, you would have to have that. I mean, knowledge is implicit, included in causation, right? Right. Okay. So if we have said and said precedentially that temporal proximity alone can satisfy that causation standard, why isn't it enough in this case for Ms. Casey to come forward and say, I made an accusation of sexual harassment on a Thursday. Then coincidentally, they saw me out on my route, a route that they assigned me that was not my usual route, so that I was going to have to be stopping and looking up directions. And then they happened to see me doing something I admit I shouldn't have done, but I did. And then I'm fired. Why isn't that, under that set of circumstances, which were required to take as true at this point, enough to say a rational jury could look at that and believe it was no coincidence that Mr. LaRue was there and it was no coincidence that she was fired within five days? Well, several reasons. First, I would respectfully disagree that the case law would allow her to rely slowly on temporal proximity. I believe it's timing plus. I believe there has to be something else. But in any event. Well, let's stick with that, because this is a crucial point. What are you relying on to say that MARA isn't good law anymore? United States versus Daniels? I'm sorry, it may not be United States versus Daniels. Is Daniels versus School District of Philadelphia? Yes. All right. Daniels comes after MARA. It's another panel opinion. Can it overrule MARA? I don't believe that it did, Your Honor. But I do believe it says in there clearly. These cases depend on what's brought up before them. I don't know that each panel decides that it's stating the law for all time. Well, that's what we do when we speak presidentially, right? We say things that bind us. If we said, quote, in certain narrow circumstances and unusually suggestive proximity and time between the protected activity and the adverse action may be sufficient on its own to establish the requisite causal connection. Close quote. What does that mean if not proximity alone can do it in the right case? I agree with you. That is proximity alone. Okay. And our position is that there is no proximity alone here, because our response to that is that we weren't out to get her. She has no evidence to refute the testimony that we have on the record. Why isn't that for a jury? That's the question we have to deal with. I'm not suggesting or implying in any way that Ms. Casian's case is a winner. I'm just asking you the legal question when we have to take every inference and the record in the light most favorable to her, and our own case law says temporal proximity alone in the right case can satisfy the causation requirement. What is it about this case that would say no, proximity alone isn't good enough? It's not good enough to satisfy the causal element. Because her allegation of proximity has no foundation in terms of what actually happened. She can't show that anybody had any idea. Her premise is they were out to get me on that day, and she has no testimony to support that. In fact, there's testimony to the opposite. Well, here's the thing. If we're talking about a Thursday, Tuesday, Thursday from the time that she reported, is there some dispute? Yeah, the timing, you're correct. Right? Thursday, Tuesday, Thursday. Just looking at that, right, given what the exchange has been with Judge Jordan, how isn't that enough to get to the jury? That's the question. Are you suggesting it's because there's no work on the weekends? I'm not sure why you think that it's that particular. In five days you go from reporting instances of sexual harassment to being fired, and in the interim time for the first time you've been reported of, you know, whatever the exact driving problem that she had was, and you learn in discovery that there have been other instances of other people being found to have done the same infraction and not being fired. When you have the temporal proximity argument to lead with, that's not enough to get to the jury? That's the question. Well, let's assume that that is enough to get to the jury, because now you're bringing in other information that she has that apparently she's using to respond to pretext, or as pretext, right? So let's assume that I'm wrong, that the timing is sufficient to get her beyond that part of her case. Right. She still has to show that our reason is incorrect. She has to show that it's false. And to do that, she's got to show that, A, we went out to get her. The testimony is the exact opposite. She concedes that she committed what she committed, right? There's no dispute that she did what she did. She has to show that there is something else that we did that would make the reason we terminated her more likely than not to be retaliation, right? It's retaliation that it has to be, right? And Mr. Gorslutsky says, and I apologize, I probably just mangled your name, sir. He says, look, we have a comparator. We have somebody to point to, to say exact same infraction, different result. And that right there tells you, oh, and on top of that, you've got Mr. Sorosi, the union rep, president, who's been around for the last five years, and he says, I've never seen anybody get fired for that infraction. It happens. Never seen anybody fired for it until now. You get that in the mix. If you look at it in the light most favorable to Ms. Kasian, why does that not get to a jury? Two reasons. First is she still has to show that there's been some intent to retaliate against her. She still has to show that the – That's the proximity thing, right? You keep going back to that. Knowledge is still part of showing that there's been pretext. Personal proximity is all you need. That gets you to the jury. What you're talking about isn't an impediment to get to the jury, and if it does, then we're done. If temporal proximity is enough to supplant knowledge, then I think you lose, right? I understand you to be saying it's not enough to supplant knowledge. For example, person complains to supervisor about harassment on the job. The very next – at 4 o'clock in the afternoon, right, the next morning at 9 o'clock, employee comes in and is fired by the head of human resources. That's pretty good temporal proximity, right? Right. As I understand your argument, you have to say, well, you've got to link up that somehow the head of human resources knew that employee complained to supervisor. Is that your argument? Right. That's my position. Sometimes these things happen where maybe someone knows or anticipates they're about to get fired at 9 in the morning, and they go and complain to supervisor about mistreatment, et cetera. Your argument is, well, that temporal proximity isn't enough. You've got to show that the decision maker that fired the person knew about the complaint. Right. Otherwise, the complaint can't sustain a retaliation case because it's the proverbial tree falling in the forest. Right. That would be our position. All right. That's your position. Now, here, let's apply your position to the facts of the case. Who fired Casey? The postmaster who testified he had no knowledge of her protective activity. Which is who? Postmaster Olsavsky. Okay. And to whom did she complain? She complained to Supervisor Hauser. And what's the evidence in the record that Olsavsky knew about the complaint to Hauser? He testified he had no knowledge, and she's never rebutted that with anything. All right. So then the whole case comes down to whether we make a legal determination that temporal proximity is enough regardless of whether there's any connection or knowledge between the complaint made to Person A and the decision to terminate made by Person B. Right. And that would be our position with regard to that part of the case. But going back to the issue of her refuting our legitimate non-discriminatory reason by showing that it's pretext, this Court just decided the Willis case, which I cited in the 28J letter, which points out at the very end, it's a higher level of specificity that's required when you come back and try to show pretext. And she hasn't met that burden here. And it's because if you look at the record, there is – What is the – yeah. District Court didn't decide that, though, right? True, but this Court confirmed that. District Court said no prior fish at case. Right. That's your fallback position is we can affirm for the alternative reason of pretext. Right. That's correct. And what are you pointing to in Willis to say? It's on the last page of the decision where the Court says – More importantly? The evidence Willis provides on the other employee's non-discipline is not appropriate at the pretext stage where the factual inquiry into the alleged discriminatory motives of the employer has risen to a new level of specificity. The rumored unspecified and uncorroborated evidence concerning a single employee fails to establish pretext. When you say a single employee, here we have the assertion that there was another employee that wasn't disciplined, and then we have Cirosi's testimony that this happened – this kind of infraction happened on other occasions and nobody was disciplined for it. Okay. Taking those in turn – Those two pieces of evidence. There's nothing to substantiate Cirosi's statement. Well, that's – now you're weighing the evidence. Is the jury entitled to hear that evidence and to consider it and to believe it? Okay. I believe it's more in the form of speculation, but if you want to believe it, obviously it's your opportunity to do that. Well, hold on just a minute. It's not speculation. He's making an assertion of historical fact. You can believe him or you cannot believe him. But his assertion of historical fact is, in effect, I'm the union president. I've been around this post office for years. I see these problems come up. I know people have done this before, and I know that they haven't been disciplined. That's it in a nutshell. Now, they can believe him or not believe him. He's a percipient witness who says he's aware of this, and it shows what the practice is at that post office. Is there a reason why that, in conjunction with the documented instance that the plaintiff has put forward, is not enough to get to a jury on the pretext question? I agree with you. That causes a close call. But I think if you look at his testimony in full, it's important to recognize that he is talking about employees that – his full quotes – that do a good job, employees that do what they're supposed to do. He's not comparing apples and oranges. He's talking about employees that fail to provide – that have had a prior history. Well, I guess that would be pretty good cross-examination. Okay. Okay. With regard to the two witnesses that he – or the two individuals that he claims are going to be comparators, there's insufficient evidence of those. Specifically, with regard to the person – the only piece of evidence in the record is at page 201. It's a driving observation form that says on there that he allegedly did the same thing. I don't believe he did the same thing, but let's assume that for purposes of discussion, that he did exactly the same thing, that he crossed three lanes of traffic as Casey and did. The testimony that was elicited was that Supervisor LaRue did not remember the incident, did not remember what disciplinary steps were taken. There's the assumption that no disciplinary steps were taken. There's no evidence to indicate that there wasn't. Okay. Let me ask you – just switching gears for a minute here. One of the things that the plaintiff complains about is that in deciding whether Ms. Casey had an objectively reasonable, good-faith belief that what she had engaged in was protective activity, the district court said, no, she didn't have that. And it actually applied the hostile work environment standard and said she hasn't made out a case of hostile work environment. They ascribe error to that, saying that misunderstands the law. She doesn't have to make her claim. She doesn't have to be right about it. It has to be a reasonable, good-faith belief. Are they correct that the district court misstepped in that regard? No. I think if you look at the district court's opinion at pages 16 through 20, it sets forth the correct standard that it has to be a reasonable belief on a good-faith basis. The court also says courts must determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of discriminatory conduct, severity, et cetera, et cetera. And it cites the standard for establishing there's a hostile work environment. That's the language the court uses. So why are they wrong in saying that the judge was wrong? Because the judge cited cases that stand for the proposition that you have to make a showing. We're on summary judgment. She has to make an inference showing, correct, to get beyond that. She only has to show that a reasonable person could, in good faith, think that based on my supervisor asking me three times for a shot of me in my bikini, my supervisor saying, hey, get that cold sore looked at with the tone evidently implying herpes and a sexual connotation, stay off your knees, and your shorts are pretty short, that those things might lead not a lawyer but just an ordinary person in the workforce to think, this guy's messing with me on a sexual basis and it's wrong. Is that what she has to show or does she have to go into court on the summary judgment stage to show she had a reasonable good faith by proving hostile work environment? She does not have to prove a hostile work environment. I don't believe that's what the district court required. And I think if you look, even if he did apply the wrong standard, if you look at her individual complaints, the timing is, some of these happened a year and a half before her termination. The bikini incident, she's the one that brought the photograph in. So I don't know how you can have an unwelcome comment when you're the one that brings it in and puts it, in her words, out for everyone to see and shows it to four or five employees, some of whom are men, some of whom are women. If you brought a picture of yourself to work and your boss said something more egregious than is said here, and we can leave it to the imagination, I won't be graphic for the purposes of the record, you're saying that could not be, that could not form a basis, along with other things of sexual harassment, just because she brought it in? Everything is fact specific, but I think it's unprofessional, I mean, maybe not illegal behavior, but unprofessional. That's a judgment. That's your judgment. It's unprofessional. But on the other hand, you bring something in, how can you then say the comments are uninvited? Well, because if you bring a photograph to the office to show to your friends, are you inviting everybody to come up and look at it and comment on it? In your own testimony, you say, I put it out for everyone to see. Okay. Well, thank you for your argument, Ms. Irwin. I appreciate it. Mr. Gorsalski, we'll hear you on rebuttal. Thank you, and we would ask the court to affirm the grant of summary judgment in favor of the Postal Service. Right. Your Honor, just a brief clarification on this picture issue. The testimony was not that she brought a single picture of her in a bikini. She brought a sleeve of pictures from her vacation in, some of which included her at a pool on the vacation, and that was overlooked by the supervisor. Clarification on this issue with who ultimately made the decision to terminate her. Postmaster Olsoski affirmed Mr. LaRue's decision, but the testimony from both Mr. Olsoski and Mr. LaRue were that the supervisor is the one who makes the discretionary determination if discipline is going to be brought. So they're both decision makers? They're both decision makers, but based on their testimony, it's the supervisor who's making that initial decision. And if we follow the Catspaw theories of liability, you've got a decision maker who we're alleging has retaliatory animus, who is influencing that entire chain of command. So you've made the Catspaw argument here? Yes. That was in the brief. Absolutely, and I think it's even more applicable in this case than usual because of the amount of discretion that's given to the supervisor in general. Now, what's the evidence in the record that the complaint to Hauser was brought to the attention of LaRue or Olsoski? There's no direct evidence of record. So the case comes down to what we were talking with Ms. Irwin about, that if temporal proximity is enough, you win, and if temporal proximity still requires causation, you lose. I think we could win on temporal proximity alone, but I think all the other factors also come into it, all of the other instances that we pointed to that would show that this decision isn't made in other circumstances. So you have to ask, why would LaRue make this decision in this case? And I think the reasonable inference is that was because five days later, this girl just reported me for sexual harassment. I think that's a reasonable conclusion that a jury could reach. Finally, about this issue of the other driver's record, where the similar crossing lanes of traffic with the door open was reported and this person was not disciplined, the Postal Service is the custodian of record. We requested those forms. They provided them to us. I think the form speaks for itself, but if it didn't speak for itself, the Postal Service had the opportunity to provide us with the facts surrounding that situation to say, oh, no, this was much different, this is why this person got a discussion, but they didn't do that. It's not on us to go deeper into it, because I think, frankly, the form speaks for itself. Well, is it not on you to establish that a comparator, because that's what you're doing, you're saying this is a comparator. It's not your burden to show that the comparator is similarly situated? I think we did that with the form itself. It shows the exact same circumstances, and the Postal Service continues to bring up Ms. Casian's prior history. When Mr. LaRue testified repeatedly, I pushed him a number of times on his deposition to say whether or not her prior accidents, two of which were not even her fault, factored into his decision. He repeatedly said no. One of which was a slip and fall, so I'm curious how that made it in there. Absolutely. All right, thanks. Thank you. You've got your argument. We appreciate counsel's briefing and argument today. We've got the matter under advisement. We'll recess for it.